STATE OF MINNESOTA     )
                       ) ss.  AFFIDAVIT OF DAVID LIGNEEL
COUNTY OF RAMSEY       )

1.     I am a licensed Peace Officer of the State of Minnesota and has been for over 28 years.  I am currently employed as a sergeant with the Minneapolis Police Department (MPD) assigned to the Robbery Unit, and have served in this capacity for over two years.  I have been with the Minneapolis Police Department for 26 years, and have served as an officer and sergeant in the Patrol Division, and as an investigator with the MPD / Federal Bureau of Investigation (FBI) Safe Streets Violent Gang Task Force for over 10 years.  I am also currently a Task Force Officer with the FBI, serving on the Violent Crimes Task Force.  In the execution of my duties, I have received training in conducting investigations of Organized Crime and Street Gangs, financial crimes investigations, basic narcotics investigations, how to utilize informants, how to conduct social media investigations, as well as training in how to field-test suspected narcotics, concealment methods used to hide narcotics in vehicles, and basic search warrant writing.  I have received training from a number of different sources ranging from the U.S. Department of Justice, Midwest County Drug Training Center, Minnesota Bureau of Criminal Apprehension, and the Minneapolis Police Department.

2.     This affidavit is submitted for the limited purpose of establishing probable cause in support of issuing a complaint and arrest warrant for Derrick

John THOMPSON for possession with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("fentanyl") in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B); possession of a firearm by a felon in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8); and carrying a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

3.      This affidavit is based on my personal knowledge, as well as information I have learned from other law enforcement officers and the review of reports, written materials, and recordings.  This affidavit does not include all the details I have learned regarding this investigation.   Rather, it only includes information believed to be sufficient to establish probable cause.

## PROBABLE CAUSE

4.      On June 16, 2023, a trooper of the Minnesota State Patrol was parked at a bus stop overwatching I-35W in South Minneapolis, Minnesota. The trooper was using radar to check for speeding vehicles.  At about 10:09 p.m., the trooper saw a black Cadillac Escalade speeding north on I-35W.  The trooper's radar showed that the Cadillac Escalade was traveling 95 miles per hour in a 55 mile per hour zone.  The trooper began following the Cadillac Escalade but was too far away to initiate his emergency lights to make a stop.

5.     The driver of the Cadillac Escalade weaved around other vehicles, then abruptly cut across four lanes of traffic to exit I-35W at the Lake Street exit on 2nd Avenue South.  The trooper advised his dispatch that he would not initiate a traffic stop because the driver of the Cadillac SUV was driving erratically, and the trooper did not want to cause the driver to continue to drive recklessly on city streets.

6.     The trooper saw the driver of the Cadillac Escalade continue to speed north on 2nd Avenue South toward the intersection of 2nd Avenue South and East Lake Street.  The driver of the Cadillac Escalade sped through a red light at the intersection without stopping or slowing.  The Cadillac Escalade struck at full speed the driver's side of a Honda Civic that was traveling lawfully through the intersection.  The trooper called for emergency response and responded to the intersection.

7.     The trooper encountered a pedestrian who reported that a black male had fled the Cadillac Escalade on foot through an alley.  The trooper went to the Honda Civic, and saw that all of the occupants of the vehicle had been killed in the crash.

8.     Officers of the Minneapolis Police Department responded to the scene.  A witness with the initials M.M. approached an officer and said he had seen the driver of the Cadillac Escalade run from the crash to the back of a nearby Taco Bell restaurant.  M.M. described the driver as a black male with

3

dreadlocks, a white t-shirt, and green pants.

9.    Another witness with the initials D.P. told officers that she had seen a man who was over 6' tall running from the scene wearing a white t-shirt, gray or green sweatpants, and a skull cap with shoulder-length dreadlocks.  D.P. said the man was running with a limp, and had a cut on his forehead.[1]

10.    Officers went to Taco Bell and saw a man (later identified as THOMPSON) sitting on the curb.  THOMPSON was wearing a white t-shirt and green camouflage jeans.  He had shoulder-length dreadlocks and appeared over 6' tall.    THOMPSON had a cut on his head that was bleeding. THOMPSON also had blood on his hands, and officers could see he was visibly sweating.  THOMPSON was sitting next to a woman with the initials C.S. Officers asked THOMPSON about his injuries, and THOMPSON said he had fallen earlier, and that the injuries were old.  However the injuries appeared fresh to the officers.  C.S. claimed that THOMPSON had been sitting next to him for almost a half an hour, but said she did not know who THOMPSON

---

[1] Another witness, with the initials A.M.O., said he heard a large crash and saw an "Escalade flipping over." A.M.O. said he ran to the scene and saw two men get out of the Escalade and run. A.M.O. described one occupant as a light-skinned 6'1 black male with ripped light blue jeans, and having dreadlocks to his shoulders. A.M.O. said the other occupant was a dark-skinned black male. A.M.O. said he walked away because he did not "want to disrespect the dead."

4

was.

11.     The officers detained THOMPSON.     After confirming that THOMPSON did not need emergency medical treatment himself, they drove THOMPSON to the scene of the crash so that the trooper and other witnesses could confirm or deny that he had been the man they saw flee from the Cadillac Escalade.  While sitting in the police vehicle, THOMPSON asked an officer how long this would take, because it was Friday, and he had things to do.

12.     Meanwhile, emergency responders confirmed that four adult females and one juvenile female had been killed when the Cadillac Escalade struck their Honda Civic.  The ages of the victims were 23, 20, 19, 19, and 17.

13.     When THOMPSON was returned to the scene, witness D.P. saw THOMPSON, and indicated that she believed THOMPSON was the man she saw running from the scene of the crash.  D.P. reiterated that the driver had been limping.  As officers escorted THOMPSON back to the squad car, D.P. saw THOMPSON limp, and said "One hundred percent, that is him."

14.     Officers noticed that THOMPSON's demeanor changed as they remained with him: he became uncommunicative and lethargic, and his eyelids began to droop.  THOMPSON was transported to the Hennepin County Medical Center by ambulance for evaluation.  Officers obtained a warrant to draw a sample of his blood.

15.     An officer on-scene found a Hertz rental record for the Cadillac

5

Escalade lying on the ground near the front door of the Cadillac Escalade. The name on the record was "Derrick Thompson." The record indicated that the Cadillac Escalade had been rented at 9:46 p.m. from a Hertz located at the Minneapolis St. Paul (MSP) Airport earlier that night—approximately a half hour before the crash. Officers of the MSP Police Department obtained surveillance video from the airport Hertz, which showed THOMPSON at the rental counter renting the vehicle that night.

16.    Later that night, witness M.M. went to the Minneapolis Police Department and shared with officers video he had taken of the crash. The video shows a black male in a white shirt and tan pants limping toward M.M.'s vehicle. The man can be heard asking M.M. for a ride, which M.M. refuses. M.M. saw a photograph of THOMPSON, and said he believed THOMPSON was the man who fled from the scene.

17.    On June 17, 2023, I obtained a warrant to search the Cadillac Escalade. On the front passenger floor was a black leather bag that had the following:

- a Glock model 27 .40 caliber semiautomatic pistol bearing serial number BWKA073. The firearm was loaded, and had an extended magazine.

- Three bags containing a total of 2,169 blue "M-Box 30" pills that I recognize in my training and experience to be fentanyl commonly illegally sold by drug traffickers. The pills field-tested positive for fentanyl, and weighed 238 grams without packaging.

- A plastic bag containing 14 additional grams of a substance that field-tested positive for fentanyl.

- Thirteen pills that field-tested positive for MDMA ("ecstasy").

- A plastic bag that contained 35 grams of a substance that field-tested positive for cocaine.

18.    Also on the front passenger floor was a yellow case containing a

digital scale with white powder residue, and a baggie of suspected marijuana.



Fig. 1:  The firearm, magazine, and ammunition found in the Cadillac Escalade.



Fig. 2: The controlled substances found in the Cadillac Escalade.

19.     I know in my training and experience that this amount of fentanyl is far more than a "user amount" that a fentanyl user would typically possess. The amount and packaging are consistent with drug distribution and sales. I also know that the presence of different types of controlled substances, and the presence of a digital scale, are consistent with drug distribution.

20.     I know in my training and experience that firearms are tools of the drug trade. Drug traffickers often carry firearms to protect themselves from being robbed of their controlled substances and cash. Drug traffickers also

carry firearms to enforce sales, to collect drug debts, and to protect their drug territory.

21.     A review of THOMPSON's Minnesota criminal history indicates that, prior to June 16, 2023, he had been convicted of the following crime, which was punishable by a term of imprisonment exceeding one year:

| Offense | Place of Conviction | Date of Conviction (On or About) |
|---|---|---|
| Fifth Degree Drug Possession | Ramsey County, MN | October 1, 2015 |

22.     THOMPSON was sentenced to a term of imprisonment of one year and one day for this offense, and therefore knew that he had been convicted of at least one crime punishable by a term of imprisonment exceeding one year.

23.     THOMPSON also has a 2018 Ramsey County conviction of fleeing a police officer in a motor vehicle.

24.     THOMPSON's criminal history also indicates a conviction from California.   I have reviewed a copy of THOMPSON's National Crime Information Center (NCIC) records.  From my review of NCIC records, and from consultation with colleagues in law enforcement, it is my understanding that in 2018, THOMPSON was convicted after fleeing a police officer in a motor vehicle while carrying multiple pounds of marijuana in California.  During this pursuit, THOMPSON struck and severely injured a pedestrian before hitting a building with his vehicle and then fleeing on foot.  THOMPSON appears to

have been convicted of hit and run causing permanent injury or death, and conspiracy to commit a crime. He appears to have been sentenced to eight years' imprisonment.

25.    I have consulted with an ATF Interstate Nexus Expert, who has made a preliminary determination that the Glock model 27 .40 caliber semiautomatic pistol bearing serial number BWKA073 was not manufactured in the State of Minnesota. As a result, the firearm had to travel in interstate and/or foreign commerce prior to arriving in the State and District of Minnesota on June 16, 2023.

26.    Based on the information set forth above, there is probable cause to believe that Derrick John THOMPSON violated Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), by possessing with intent to distribute 40 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("fentanyl"); Title 18, United States Code, Sections 922(g)(1) and 924(a)(8), by possessing a firearm as a felon; and Title 18, United States Code, Section 924(c)(1)(A)(i), by carrying a firearm during and in relation to a drug trafficking crime.

Further your Affiant sayeth not.

David Ligneel
Task Force Officer, FBI

SUBSCRIBED and SWORN before me
by reliable electronic means via FaceTime and
email pursuant to Fed. R. Crim. P. 41(d)(3) on
June 21, 2023:

ELIZABETH COWAN WRIGHT
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MINNESOTA